IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| JONATHAN RITCHIE, Individually ) | CIV. NO. 10-00209 JMS-BMK |
| and as the Personal Representative of ) | |
| the Estate of Gregory Ritchie, ) | ORDER GRANTING DEFENDANT'S |
| ) | MOTION TO DISMISS FOR LACK |
| Plaintiff, ) | OF JURISDICTION |
| ) | |
| vs. ) | |
| ) | |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

## ORDER GRANTING DEFENDANT'S MOTION TO DISMISS FOR LACK OF JURISDICTION

## I. INTRODUCTION

Plaintiff Jonathan Ritchie ("Plaintiff" or "Ritchie"), individually and

as the personal representative of the Estate of Gregory Ritchie ("Gregory"),

brought this action under the Federal Tort Claims Act, 28 U.S.C. § 1346(b),

seeking recovery for his own injuries and for the wrongful death of his infant son

Gregory. Defendant United States ("Defendant" or "the Government") moves to

dismiss under Federal Rule of Civil Procedure 12(b)(1) for lack of jurisdiction,

contending that (1) the action is barred under *Feres v. United States*, 340 U.S. 135,

146 (1950), and (2) the claim of the Estate of Gregory Ritchie is barred by the two

year statute of limitations in 28 U.S.C. § 2401(b).

For the reasons set forth, the Motion is GRANTED. The court lacks subject matter jurisdiction.

## II. BACKGROUND

### A. Circumstances of the Death of Gregory and Injuries to Plaintiff

For purposes of this Motion, the court assumes the following as true, as taken from (1) the Complaint's factual allegations [Compl. (Doc. No. 1) at 3-5], (2) responses Plaintiff gave during the administrative claims process [Mot. Ex. 1 (Doc. No. 13-4)], and (3) other exhibits provided by Defendant [Doc. Nos. 13-5 to 13-8]. *See, e.g.*, *Augustine v. United States*, 704 F.2d 1074, 1077 (9th Cir. 1983) ("In ruling on a challenge to subject matter jurisdiction, the district court is ordinarily free to hear evidence regarding jurisdiction."); *Dreier v. United States*, 106 F.3d 844, 847 (9th Cir. 1996) (reasoning that, when considering items outside the pleadings in a Rule 12(b)(1) motion, courts construe disputes of fact in favor of the non-movant).

In August of 2006, Plaintiff's wife, January Ritchie ("January"), was a Specialist on active duty in the United States Army stationed at Fort Shafter in Honolulu, Hawaii. Doc. No. 1 ¶ 7; Doc. No. 13-7 at 4. January was pregnant. Doc. No. 1 ¶ 8. Previously, on June 1, 2006, while January was stationed in

2

Missouri, an Army physician had completed a "pregnancy profile" for January that limited her physical activities. Doc. No. 1 ¶ 8; Doc. No. 13-5 at 4. Among other conditions, the profile limited January's running and walking, and indicated she was not able to carry and fire weapons, or move with "fighting loads." Doc. No. 13-5 at 4. It specified "no [physical training ("PT")] testing; may mow grass . . . may march up to 2 miles[;] may lift up to 20 lbs[;] avoid parade rest greater than 15 minutes." *Id.* After the profile was issued, January was transferred to Fort Shafter sometime before August 7, 2006. Doc. No. 1 ¶ 7; Doc. No. 13-5 at 2.

After transferring to Hawaii, "January was made to do battle focused PT every Thursday, beginning in July 2006, even if she did not feel up to it." Doc. No. 13-4 Ex. 1-3, at 2. "For battle focused PT, January had to land navigate across Helemano base from point to point. . . . She performed these tasks even though she told [her supervisor/commander] Sgt. Murray that she was not able to do these tasks because of her pregnancy and her profile." *Id.* "Sgt. Murray told her that she had to do it regardless of her pregnancy and her profile." *Id.* January's superiors had been informed of her pregnancy profile and "the importance of following" the profile. *Id.* at 2-3.

On August 7, 2006, "January was also made to conduct a trash pick-up around the base. She was made to walk all around the housing area picking up

trash. . . . [SSgt.] Schave yelled and treated her very poorly when she was not able to keep up with the other soldiers[.]" *Id.* She told Schave she was in pain, but he told her "he did not care" and told her "to get out of there." *Id.* at 3. She was later taken by ambulance to the emergency room at Wahiawa General Hospital. *Id.* at 2-3. At the hospital, a civilian doctor (provided under the TRICARE program[1]) discovered she had an "obvious incompetent cervix" and, because of the weakness, an "emergency cervical cerclage was done." Doc. No. 13-4 Ex. 3A; Doc. No. 1 ¶ 9.

By letter of August 14, 2006, January's civilian doctor instructed "[t]o whom it may concern" that "[t]o protect her against preterm delivery she should avoid any prolonged standing or lifting for the remainder of her pregnancy. She should limit her work day to 8 hours a day and a maximum of 40 hours weekly." Doc. No. 13-4 Ex. 3A. On August 24, 2006, January's doctor wrote a letter stating "[January] will be unable to perform her normal work duties for the remainder of her pregnancy. She will be confined to quarters with limited activities until her delivery. Diagnosis: Incompetent Cervix, 20 weeks gestation." *Id.* Ex. 3B.

---

[1] *See Doe v. United States*, 419 F.3d 1058, 1060 (9th Cir. 2005) ("The purpose of [TRICARE] is to create and maintain high morale in the uniformed services by providing an improved and uniform program of medical and dental care for members and . . . their dependents. With respect to pregnancy, TRICARE may provide funding for medically necessary services and supplies associated with maternity care[.]") (citations and quotations omitted).

Plaintiff alleges that Army personnel followed neither the profile nor the instructions from January's civilian doctor. On August 26, 2006 January returned to the hospital, where Gregory was born prematurely but died approximately thirty minutes after birth. Doc. No. 1 ¶ 12-13; Doc. No. 13-4 at 2. Gregory "suffered the loss of his life," and was deprived of "the enjoyment of the rest of his life and all future earnings." Doc. No. 1 ¶ 13. As a result, Plaintiff suffered physical and mental pain and emotional distress. *Id.* ¶ 14.[2]

---

[2] These facts are not seriously contested by Plaintiff. Indeed, in his scheduling conference statement, Plaintiff summarizes his case consistently as follows:

This case arises from the personal injuries and wrongful death suffered by Plaintiff's infant son, Gregory Ritchie, and the consequent emotional and psychological devastation wrought upon Plaintiff. Plaintiff's wife and Gregory's mother, January Ritchie, was pregnant with Gregory while she was serving on active duty with the United States Army and stationed at Fort Shafter. The Army was aware that January Ritchie was pregnant and, by June 1, 2006, performed a "pregnancy profile" which imposed a number of restrictions on her activities for the health, safety, and welfare of Gregory Ritchie. However, officers, members, and/or employees of the Army disregarded those restrictions which caused January Ritchie to undergo an emergency cerclage procedure on or about August 7, 2006 in an effort to prevent a premature birth. At the hospital, immediately following that procedure, January Ritchie's doctor informed officers, members, and/or employees of the Army of the procedure and restricted January Ritchie's work for Gregory Ritchie's health, safety, and well-being and reiterated his concerns and instructions in a letter; however, officers, members, and/or employees of the Army continued to disregard the doctor's instructions resulting in Gregory Ritchie's premature birth and subsequent death on or about August 26, 2006.

Doc. No. 11 at 2-3.

**B.     Administrative and Judicial Proceedings**

On August 15, 2008, the Government received an administrative claim for damages resulting from Gregory's death. The claimant was listed as "Jonathan Ritchie." The claim form asks claimants to state the nature of the injury forming the basis of the claim. Plaintiff wrote "[d]eath of our infant son due to Army's failure to implement and follow physicians' advice and limitations on physical activity for my pregnant wife." Doc. No. 13-4 Ex. 1. The form asks for the "basis of claim," and Plaintiff provided, in part, that

> [m]y wife, January Ritchie, was pregnant with our child
> and was required to engage in physical exercises and
> other duties against the advice of her physicians resulting
> in the loss of pregnancy at twenty-two weeks. . . . Our
> son was delivered at Wahiawa Hospital on August 26,
> 2006, and was pronounced dead shortly after his birth.

*Id.* During the claims process, the Government asked Plaintiff whether January's was a high risk pregnancy before Army personnel required physical exercises. Plaintiff responded through counsel that "January was not a high risk pregnancy until the vigorous work that the Army put her through, and the stressful environment she was forced to endure because certain soldiers made the work environment hostile." *Id.* Ex. 1-3 at 3.

Over a year later, on September 23, 2009, the Government received a second administrative claim regarding Gregory's death. The claimant for this

claim was listed as "Jonathan Ritchie on behalf of Gregory Ritchie." Doc. No. 13-4 Ex. 1-5. The cover letter for the claim states, "This form does not replace or amend the [claim] received by the Army on August 15, 2008, on behalf of claimant Jonathan Ritchie himself." Doc. No. 13-4 Ex. 1-4. Similar to the prior claim, the nature of the claim was stated as "[w]rongful death due to the Army's failure to implement and follow physicians' advice and limitations on physical injury for January Ritchie." *Id.* The "basis of the claim" explained: "January Ritchie, Gregory's mother, was pregnant with Gregory when she was required to engage in physical exercises and other duties against the advice of physicians resulting in Gregory's premature death." *Id.*

On November 17, 2009, the Government denied both administrative claims, concluding that they were barred by *Feres* as "arising out of or in the course of activity incident to service" of January, and that Gregory's claim was also barred by the limitations period in 28 U.S.C. § 2401(b). Doc. No. 13-7. Plaintiff filed this suit on April 13, 2010, asserting claims for negligence and emotional distress. The Government filed its Motion to Dismiss on January 31, 2011. Plaintiff filed an Opposition on March 28, 2011, and the Government filed a Reply on April 4, 2011. The court heard the matter on April 18, 2011.

# III. <u>STANDARD OF REVIEW</u>

Rule 12(b)(1) allows a party to seek dismissal of a claim for lack of subject matter jurisdiction. "[A] Rule 12(b)(1) motion can attack the substance of a complaint's jurisdictional allegations despite their formal sufficiency, and in so doing rely on affidavits or any other evidence properly before the court." *St. Clair v. Chico*, 880 F.2d 199, 201 (9th Cir. 1989). "With a [Rule] 12(b)(1) motion, a court may weigh the evidence to determine whether it has jurisdiction." *Autery v. United States*, 424 F.3d 944, 956 (9th Cir. 2005). When a court considers evidence in a Rule 12(b)(1) motion, it construes disputes of fact in favor of the non-movant. *Dreier*, 106 F.3d at 847.

The FTCA requires a plaintiff to exhaust administrative remedies before bringing suit. 28 U.S.C. § 2675(a).[3] To exhaust, a plaintiff must (1) file a claim with the appropriate federal agency within two years of the claim's accrual; and (2) file suit within six months of an administrative denial of the claim. 28

---

[3] 28 U.S.C. § 2675 provides:

An action shall not be instituted upon a claim against the United States for money damages . . . unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail. The failure of an agency to make final disposition of a claim within six months after it is filed shall, at the option of the claimant any time thereafter, be deemed a final denial of the claim for purposes of this section.

U.S.C. § 2401(b).[4]  The statute of limitations in § 2401(b) is jurisdictional, *Marley v. United States*, 567 F.3d 1030, 1038 (9th Cir. 2009), and the exhaustion requirement is strictly construed.  *See Vacek v. U.S. Postal Serv.*, 447 F.3d 1248, 1250-51 (9th Cir. 2006) ("[Courts] have repeatedly held that the exhaustion requirement [of the FTCA] is jurisdictional in nature and must be interpreted strictly. . . .  Any such waiver must be strictly construed in favor of the United States.").

## IV.  DISCUSSION

### A.    *Feres* Principles

The FTCA waives the federal government's sovereign immunity for certain actions arising out of the alleged negligent act or omission of any employee of any federal agency.  *See* 28 U.S.C. § 1346(b).  It can render the United States liable "in the same manner and to the same extent as a private individual under like circumstances[.]"  28 U.S.C. § 2674.  The FTCA, however, is subject to several exceptions.  Under one exception -- known as the "*Feres* doctrine" based on

---

[4] 28 U.S.C. § 2401(b) provides:

A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues or unless action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented.

principles originating in *Feres*, 340 U.S. at 146 -- the United States is not liable for injuries that "arise out of or are in the course of activity incident to [military] service." *See, e.g.*, *McConnell v. United States*, 478 F.3d 1092, 1095 (9th Cir. 2007) (holding that recovery under FTCA for service member's death resulting from waterskiing accident was barred by *Feres*, where boat rental from Air Force recreation center was "incident to service").

       *Feres* bars not only suits by service members against military superiors, but applies equally to suits by third parties (*i.e.*, non-military plaintiffs), if the injuries arise out of activity incident to military service. *See, e.g.*, *Stencel Aero Eng'g Corp. v. United States*, 431 U.S. 666, 673 (1977) ("[W]here the case concerns an injury sustained by a soldier while on duty, the effect of the action upon military discipline is identical whether the suit is brought by the soldier directly or by a third party."); *see also Monaco v. United States*, 661 F.2d 129, 134 (9th Cir. 1981) (rejecting claim by daughter of service member for her derivative injuries caused by injury to her father because "the court still must examine the Government's activity in relation to military personnel on active duty" and relying on cases "rejecting the claims of non-military plaintiffs seeking recovery for independent injuries stemming from allegedly negligent acts against military personnel").

The doctrine is often criticized. *See, e.g.*, *United States v. Johnson*, 481 U.S. 681, 703 (1987) (Scalia, J., dissenting) (commenting on the "unfairness and irrationality" of *Feres*); *Costo v. United States*, 248 F.3d 863, 869 (9th Cir. 2001) ("[W]e join the many panels of this Court that have criticized the inequitable extension of this doctrine[.]"). Nevertheless, courts have extended it even beyond the FTCA. *See, e.g.*, *Bowen v. Oistead*, 125 F.3d 800, 803 n.2 (9th Cir. 1997) (extending *Feres* to bar claims under 42 U.S.C. § 1983 by national guard members against state officers). "[P]ractically any suit that 'implicates the military judgment and decisions' runs the risk of colliding with *Feres*." *Persons v. United States*, 925 F.2d 292, 295 (9th Cir. 1991) (quoting *Johnson*, 481 U.S. at 691). *Feres* is essentially a doctrine of "intramilitary immunity." *Hodge v. Dalton*, 107 F.3d 705, 710 (9th Cir. 1997).

The *Feres* doctrine can apply "whenever a legal action would require a civilian court to examine decisions regarding management, discipline, supervision, and control of members of the armed forces." *Zaputil v. Cowgill*, 335 F.3d 885, 887 (9th Cir. 2003) (citations and internal quotations omitted). "The test has been broadly construed to immunize the United States and members of the military from any suit which may intrude in military affairs, second-guess military decisions, or impair military discipline." *Id.* (citations and internal editorial marks

omitted).

Three rationales underlie the doctrine. *See Johnson*, 481 U.S. at 688-89; *United States v. Shearer*, 473 U.S. 52 (1985). First, "the relationship between the Government and members of its armed forces is distinctively federal in character." *Johnson*, 481 U.S. at 689 (citations and internal quotations omitted). "Where a service member is injured incident to service -- that is, because of his military relationship with the Government -- it makes no sense to permit the fortuity of the situs of the alleged negligence to affect the liability of the Government to the serviceman." *Id.* (citations and internal quotations omitted). In other words, Congress could not have intended the FTCA to subject the armed forces to the uncertainties of different variations of local tort law. *Feres*, 340 U.S. at 142-43.

Second, the existence of "generous statutory disability and death benefits is an independent reason why the *Feres* doctrine bars suit for service-related injuries." *Johnson*, 481 U.S. at 689. In particular, the Veterans' Benefits Act ("VBA") provides military members with "a generous alternative to recovery in tort." *Schoenfeld v. Quamme*, 492 F.3d 1016, 1019 (9th Cir. 2007). The availability of VBA benefits precludes additional remedies in tort.

Third, suits by service members for injuries incurred incident to

service "if generally permitted, would involve the judiciary in sensitive military affairs at the expense of military discipline and effectiveness." *Shearer*, 473 U.S. at 59. "The third rationale -- preserving the integrity of military discipline -- is the most robust explanation for the *Feres* doctrine[.]" *McConnell*, 478 F.3d at 1095. The Ninth Circuit "ha[s] recognized that the third rationale -- the interest in maintaining military discipline -- is 'the most persuasive justification' for the doctrine, and [its] *Feres* cases have focused mainly on whether the service [member's] activities implicate that interest." *Schoenfeld*, 492 F.3d at 1019 (citations omitted).

Nevertheless, in determining whether *Feres* applies, courts examine "the totality of the circumstances." *McConnell*, 478 F.3d at 1095 (quoting *Costo*, 248 F.3d at 867).[5] The Ninth Circuit "employ[s] a case-by-case approach, addressing four [non-exclusive] factors: (1) the place where the negligent act occurred, (2) the duty status of the plaintiff when the negligent act occurred, (3) the benefits accruing to the plaintiff because of the plaintiff's status as a service

---

[5] *See Brown v. United States*, 462 F.3d 609, 612 n.1 (6th Cir. 2006) (indicating that the Supreme Court in *United States v. Shearer*, 473 U.S. 52, 57 (1985), held that the third *Feres* rationale is "controlling" but two years later, in *United States v. Johnson*, 481 U.S. 681 (1987), "reaffirmed the full three-part analysis").

member, and (4) the nature of the plaintiff's activities at the time the negligent act occurred." *Id.  See also Schoenfield*, 492 F.3d at 1019 (observing that "our *Feres* jurisprudence is something of a muddle" and thus "comparison of fact patterns to outcomes in cases that have applied the *Feres* doctrine is the most appropriate way to resolve *Feres* doctrine cases") (citation omitted).

## B.    Application of the *Feres* Doctrine

Plaintiff's suit is premised on the Army's failure to abide by January's pregnancy profile (and her civilian doctor's subsequent instructions to limit her military activities).  As pled in the Complaint -- and as was exhausted in the administrative process -- Plaintiff's theory has consistently been that Army personnel ordered January to engage in military training or duties that contravened her pregnancy profile's or doctor's instructions.  The suit, therefore, is based on Army actions that "arose out of" activities that were "incident to" January's military service for purposes of *Feres*.  Even assuming the Army's actions may have caused injury to others (*i.e.*, to Plaintiff and to Gregory), the actions were nevertheless "incident to" January's military service.[6]  *See Stencel*, 431 U.S. at

---

[6] Plaintiff also argues that the Army owed a duty directly to Gregory "to not unreasonably expose him to foreseeable risks."  Doc. No. 16 at 9.  But whether a duty is owed (or even whether there was negligence) to a third party such as Gregory is not the question.  The question is whether the injuries complained of "arose out of" or "were incident to" January's military service.

14

673.

      Plaintiff argues that infants injured *in utero* based on acts against a service woman may state an FTCA claim -- not barred by *Feres* -- where the injury to the infant is direct, and not derivative of injury to the mother. *See, e.g.*, *Brown*, 462 F.3d at 615 (holding *Feres* did not bar claim on behalf of minor child injured by negligent prenatal care); *Romero v. United States*, 954 F.2d 223, 225-27 (4th Cir. 1992) (holding *Feres* did not bar FTCA malpractice claim of active duty service woman's child allegedly injured by inadequate prenatal care, because child's injury did not have its genesis in service-related injury to mother who was not injured). But these types of cases involve injury caused by negligent care "administered *solely* to the detriment of a civilian child" -- which *Feres* does not bar -- and do not involve "injury to a child that derives from an injury to a service-member parent, such as a birth defect caused by a parent's exposure to radiation" -- which would be barred. *Brown*, 462 F.3d at 614 (emphasis in original); *Romero*, 954 F.2d at 225 ("The sole purpose of the treatment . . . would have been directed at [the child]."). Such cases are not controlling.

      Plaintiff explained during the administrative process that "January['s] was not a high risk pregnancy until the vigorous work that the Army put her through, and the stressful environment she was forced to endure because certain

soldiers made the work environment hostile." Doc. No. 13-4 Ex. 1-3 at 3. Under this theory, the Army injured January, and her injury eventually resulted in a premature birth. That is, this case is unlike *Brown* and *Romero* because harm to Gregory occurred, at least in part, due to (service-related) injury to January.

Plaintiff contends that the restrictions in the pregnancy profile were for the health and safety of January's unborn child. But, even if restrictions in the *profile* (and subsequent limitations by January's doctor) were for Gregory's benefit, the challenged actions (the Army's *disregard* of the pregnancy profile and subsequent limitations) were not directed at Gregory -- as they were in cases like *Brown* and *Romero*. The court doubts that the profile and subsequent instructions so as to avoid premature birth were *solely* for the child's benefit -- a premature labor may certainly be dangerous to the mother as well. During the hearing, Plaintiff admitted (as the court finds must be the case) that the pregnancy profile itself was for the benefit of *both* January and her unborn child. He argues, however, that the doctor's subsequent restrictions (Doc. No. 13-4 Exs. 3A & 3B) were only for the benefit of Gregory. And, even assuming for purposes of this Motion that the argument were true,[7] Plaintiff's Complaint still challenges the

_____

[7] In fact, it appears that the civilian doctor's restrictions were to benefit both January and Gregory -- the restriction of August 14, 2006 stated in part "[t]o protect *her* [*i.e.*, January] against pre term delivery she should avoid any prolonged standing or lifting for the remainder of

(continued...)

Army's actions in *disregarding* the doctors' requests.

Plaintiff is not alleging medical malpractice; the suit does not attack the actions of Army medical personnel by claiming, for example, that the profile included insufficient restrictions. Rather, the suit is claiming that the restrictions were *correct*, and that January's Army superiors gave orders in disregard of them. Again, Plaintiff's administrative claim asserted that the Army ignored the profile and January's doctor's instructions "by requir[ing] [January] to engage in physical exercises and other duties against the advice of her physicians[.]" Doc. No. 13-4 Ex. 1. The administrative claim was that the "Army[] fail[ed] to implement and follow physicians' advice and limitations on physical activity for [January]." *Id.* The challenge, therefore, is to activities "incident to" -- indeed, directly part of -- January's military service.

The suit thus squarely implicates the primary *Feres* rationale -- avoidance of involving the judiciary in sensitive military affairs at the expense of military discipline and effectiveness. *Schoenfeld*, 492 F.3d at 1019. The action would require the court to question whether military orders were proper and potentially to interfere with matters of military discipline and policy. Most

[7](...continued)
the gestation." Doc. No. 13-4 Ex. 3A (emphasis added).

importantly, did January's superiors ignore or disregard the pregnancy profile and subsequent restrictions?  (The profile stated January "may march up to 2 miles" and "may lift up to 20 lbs" -- was it inconsistent to require January to "land navigate across Helemano base from point to point," Doc. No. 13-4 at 2, or to make her "conduct a trash pick-up around the base"?  *Id.*)  Other questions could arise:  What is the nature of the military pregnancy profile?  Do its contents rise to the level of a command order?  What are the ramifications if a soldier disregards it?  Would violations lead to military discipline?  Can a profile be modified by a commander for the needs of the military?  If so, under what circumstances?  Under *Feres*, these are exactly the types of questions that federal courts should avoid.  *See, e.g.*, *Zaputil*, 335 F.3d at 887 (reiterating that *Feres* provides immunity for "any suit which may intrude in military affairs, second-guess military decisions, or impair military discipline").

And *Feres* applies when examining "the totality of circumstances" and the factors the Ninth Circuit reiterated in *McConnell*, 478 F.3d at 1095, and *Schoenfeld*, 492 F.3d at 1019.  First, "the place where the negligent act occurred" was on a military installation (Fort Shafter or Helemano Military Reservation) where January was ordered to undergo certain physical activities or perform duties -- this factor favors a *Feres* bar.  Second, January's "duty status when the negligent

act occurred" was active duty (she was not on liberty or leave) when she was

ordered to do things contradicting the pregnancy profile -- this factor also favors a

*Feres* bar.[8]  And, the fourth factor -- "the nature of January's activities at the time

the negligent acts occurred" (being given orders in contravention of the profile and

subsequent restrictions) -- weighs heavily in favor of a *Feres* bar.[9]

      In comparing "fact patterns to outcomes in cases that have applied the

*Feres* doctrine," *Schoenfield*, 492 F.3d at 1019, this case is analogous to case law

such as *Monaco*, 661 F.2d at 134, where *Feres* bars claims by third parties

(children and spouses) because their injury is derivative of injury to the service

member.  *See also*, *e.g.*, *Grosinsky v. United States*, 947 F.2d 417, 418 (9th Cir.

1991) (holding that *Feres* bars claim by wife of soldier for an Army surgeon's

negligent vasectomy); *Persons v. United States*, 925 F.2d 292, 296-97 (9th Cir.

1991) (barring claim for breach of military hospital's duty to warn family members

of serviceman's suicidal condition because injury had its genesis in hospital's

---

[8]  The second factor is directed towards January's status, not Gregory's or Plaintiff's because the question is whether the injuries are "incident to" January's service.

[9]  The third factor -- "benefits accruing to the plaintiff because of plaintiff's status as a service member" -- appears to weigh in favor of Plaintiff.  The factor examines "benefits" accruing both before and after the injury.  *Schoenfeld*, 492 F.3d at 1020, 1024.  That is, a court examines both whether the activity was a benefit (*e.g.*, a privilege of military service) and whether compensation is received (or not received) for the injury.  Here, January was receiving medical care as a benefit of military service (as was Gregory), but the suit does not challenge the medical care.  On the other hand, nothing in the record indicates Plaintiff, either individually or on behalf of the Estate of Gregory, received compensation for the injuries.

treatment of serviceman); *Irvin v. United States*, 845 F.2d 126, 131 (6th Cir. 1988)

(dismissing FTCA action for negligent prenatal care given to military mother that

resulted in death of child four days after birth); *Mondelli v. United States*, 711 F.2d

567, 568 (3d Cir. 1983) (holding that child's suit for genetic injuries caused by

father's exposure to radiation during active duty was barred under *Feres* because

child's injuries derived from injury to father).

In short, considering "the totality of the circumstances," and

examining case law on a factual basis, this suit falls squarely within the *Feres*

doctrine.[10]

Plaintiff also asks this court to "overturn the [*Feres*] doctrine" if it is

inclined to find that the doctrine applies. Doc. No. 16 at 12. This district court,

however, has no authority to overturn a decision of a higher court. *See, e.g.*,

---

[10] In response to the Government's alternative argument that Gregory's claim is time-barred, Plaintiff contends that Gregory's September 23, 2009 administrative claim was timely because it was related to the (timely) August 15, 2008 claim of Plaintiff on his own behalf. *See Locke v. United States*, 351 F. Supp. 185, 187 (D. Haw. 1972) (describing "a judicial unwillingness to permit the United States to stand on technicalities once a [related] claim has been filed . . . particularly . . . when the rights of children are involved"). The Government, however, argues that such an equitable rationale does not apply where an estate of a child (not the child itself) is a plaintiff. *Compare Hilburn v. United States*, 789 F. Supp. 338, 342 n.4 (D. Haw. 1992) (reasoning that "the rationale for waiving the technical requirements of the FTCA for a child does not extend to the child's estate"). It is also unclear whether such an equitable theory remains valid in light of recent case law confirming that the FTCA's statute of limitations is jurisdictional and "absolute" such that estoppel or tolling is not allowed. *See Marley v. United States*, 567 F.3d 1030, 1037 (9th Cir. 2009). Because *Feres* applies, however, the court need not reach whether Gregory's claims are also barred by the statute of limitations in 28 U.S.C. § 2401(b).

*Musladin v. Lamarque*, 427 F.3d 647, 652 (9th Cir. 2005) ("Lower courts must follow the law laid down by higher courts."). The court presumes Plaintiff intended only to preserve the issue for an appellate court, which his argument has done.

## V. <u>CONCLUSION</u>

A child's premature birth and subsequent death would be devastating to any parent. As tragic as it might have been here, however, this court must apply the law as stated in *Feres* and subsequent cases. Because the *Feres* doctrine applies, Plaintiff may not proceed with this action under the FTCA. This court lacks subject matter jurisdiction. Accordingly, Defendant's Motion to Dismiss is GRANTED. Further amendment would be futile. Judgment shall enter in favor of Defendant. The Clerk of Court is directed to terminate the action.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, April 25, 2011.



/s/ J. Michael Seabright
_____
J. Michael Seabright
United States District Judge

*Ritchie v. United States*, Civ. No. 10-00209 JMS-BMK, Order Granting Defendant's Motion to Dismiss for Lack of Jurisdiction